<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

Andrew Dennis,                    :
                                  :     Civ. No. 14-6474 (RMB)
            Petitioner,           :
                                  :
      v.                          :            **OPINION**
                                  :
Stephen D'Ilio et al.,            :
                                  :
            Respondents.          :


**BUMB**, District Judge

       Petitioner Andrew Dennis ("Dennis"), an inmate confined in New

Jersey State Prison in Trenton, New Jersey, filed a Petition for a

Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 1.) He raised

four grounds for relief in his challenge to his 2001 judgment and

conviction for conspiracy, robbery, burglary, aggravated assault and

a weapons charge. Respondents filed an answer, asserting that Grounds

One, Two and Four should be dismissed on the merits; and Ground Three

is procedurally defaulted and also without merit. (ECF No. 8.) Dennis

filed a reply. (ECF No. 11, 12.)

I.    <u>BACKGROUND</u>

       The New Jersey Superior Court Appellate Division made the

following findings of fact on Dennis' direct appeal:

            These back-to-back appeals, consolidated for
            opinion purposes, arise from the armed robbery
            and aggravated assault of a drug dealer

occurring on August 14, 2000 in Atlantic City.

. . .

Tried jointly to a jury, the three defendants were convicted on all charges contained in the indictment with the exception of count three, which was dismissed by the trial court. Motions by all three defendants for judgments of acquittal or a new trial were denied.

. . .

At approximately 8:30 a.m. on August 14, 2000, Tuten left the apartment to run some errands; Dickerson and Blagrove remained. As Tuten was waiting for a cab, he met Defendant Dennis. Although Tuten did not know Dennis by name, he was familiar with him as a repeat drug customer; likewise, Dennis did not know Tuten by name, only knowing him by Tuten's street names "Chauncey Fitzgerald" and "Fat Boy." No transaction occurred at that time, but Dennis inquired when Tuten planned to return, to which Tuten answered that he would be returning in about 45 minutes. Dennis stated that he has some business to discuss with Tuten. From his apartment window, Dickerson observed the encounter between Tuten and Dennis, but was unable to hear the conversation.

Approximately one hour later, Dennis appeared at the door of Blagrove's apartment. Dickerson answered the door and recognized Dennis from observing the meeting Dennis had with Tuten earlier that morning. Dennis asked for Tuten and Dickerson told him that Tuten was not at home. Dennis then asked when Tuten would return, which Dickerson could not answer. Dennis then indicated that Tuten had instructed him to meet at the apartment; Dickerson responded that Tuten was not dealing drugs from the apartment.

At that point, Defendant Palmer stepped forward from behind the door, and told Dickerson to

2

"back up." Dickerson complied, and Dennis, Palmer and Defendant Hamilton stepped into the living room of the apartment. At the same time, Blagrove entered the living room from an adjacent bedroom. Blagrove recognized Dennis as a repeat drug customer of Tuten. Both Blagrove and Dickerson recognized Palmer as their "cousin;" Palmer's uncle had had a long-term relationship with Dickerson and Blagrove's mother. Hamilton was a stranger.

Upon their entry into the apartment, Palmer and Dennis demanded to know where Tuten was keeping his drug money, stating that they had heard they "all got $40,000 to $50,000 stashed in the house and you're all pushing weight out of the house." Both Blagrove and Dickerson repeatedly denied any knowledge of money.

Palmer admitted to Blagrove and Dickerson, to whom he referred as his "cousin," that the three men intended to rob Tuten of his drugs and money. Further, Palmer apologized for the intrusion and explained that he had not been aware that Tuten lived with Blagrove and Dickerson and if he had known that fact, Palmer stated he would not have come to the apartment.

At the same time, Palmer and Hamilton lifted their shirts and each removed an automatic handgun. As Palmer withdrew his gun he showed Blagrove and Dickerson that it was not loaded. Dennis appeared unarmed and requested that Tuten's weapon be given to him; neither Blagrove nor Dickerson knew the whereabouts of Tuten's weapon. Palmer told Dennis and Hamilton that although Tuten was fair game, Blagrove and Dickerson were not and they would be placed into the back bedroom. . . . At some point, while the three defendants were waiting for Tuten to return, Blagrove, and later Dickerson, were moved into the bedroom. From the bedroom, Blagrove and Dickerson could still hear what was transpiring in the living room.

3

When Tuten, who did not possess a key to the apartment, knocked at the door, Palmer placed a gas mask over his face and Hamilton pulled a dark blue or black bandana over his own face. Dennis, who remained unmasked throughout, opened the door. When Tuten entered the apartment, he was surprised by the presence of the three defendants. At that point, the three defendants grabbed Tuten and pistol-whipped him, causing Tuten to stumble.

Palmer moved toward the bedroom to watch Blagrove and Dickerson while Dennis and Hamilton asked Tuten questions regarding where he kept his money and stash of drugs. Tuten denied having any drugs or money, whereupon Dennis threatened to shoot him.

Tuten was then searched and Dennis removed several hundred dollars from his pocket and slapped it onto the table. Dissatisfied with the amount of money recovered, Dennis continued demanding money indicating again that he had heard Tuten was "pushing weight like 24 hours a day."

Tuten was told to strip to his undergarments and take a seat on the loveseat; he complied, explaining that they had recovered all the money he had. Hamilton threatened Tuten that if he did not stop talking, he would "pop" him. Tuten challenged Hamilton to follow through on his threat. Placing a pillow from the couch over his weapon, Hamilton shot Tuten in the right knee. Dennis then turned up the volume on the stereo in an attempt to muffle Tuten's cries.

Hamilton continued questioning Tuten while Dennis, at the request of Palmer, began duct-taping Tuten. Palmer left his post guarding Dickerson and Blagrove to inspect Tuten's wound, and reported to Dickerson and Blagrove that Tuten was alright and had only suffered "a little gunshot wound."

4

Dennis continued wrapping Tuten in duct tape as Tuten stated that they were in the "wrong place." Again Hamilton threatened to shoot Tuten and again Tuten challenged Hamilton to follow through; Tuten was then shot again, this time in his left knee.

The continued search by defendants for more money proved unsuccessful and Blagrove and Dickerson were then escorted into the bathroom, where they were instructed to wait for ten minutes before calling an ambulance. The telephone lines were disconnected and the three defendants then left the apartment.

Tuten began calling out for help and managed to free himself of some of the duct tape. Moments later Dickerson appeared from the bathroom, reconnected the phones, called for an ambulance and, at Tuten's request, telephoned Tuten's girlfriend to inform her of his condition.

Also at the request of Tuten, Dickerson tried to move Tuten into the hallway and began to dispose of any drugs. Dickerson placed some bags of marijuana in Blagrove's body brace and attempted to flush several baggies of crack cocaine down the toilet. When the bags did not flush, Blagrove removed them and placed them in his pockets. Dickerson began mopping the bloodied floor.

The first police officers to respond to the scene found Tuten in the doorway of the apartment. Initially, Tuten stated that he had been shot in the hallway. The officers went inside the apartment and found drugs on Blagrove. The police officers ordered Dickerson to stop mopping the floor, and he and Blagrove were removed from the apartment.

When Tuten was asked by the police officers for a description of his assailants, Tuten stated that were three black males and one wore a yellow fleece. A suspect wearing a yellow fleece-like

5

jacket was immediately returned to the apartment but Tuten stated he was not one of the assailants.

Detective Riegel arrived at the scene and informed Dickerson of his rights under Miranda. Dickerson waived his rights and reported that three men had shot Tuten. Blagrove and Dickerson were transported separately to the police station for further questioning.

While Tuten was being taken to the hospital, an officer attempted to question him concerning the incident. Tuten misidentified himself as Chauncey Fitzgerald and provided limited information, again stating he had been attacked by three men and that one was wearing yellow fleece.

. . .

While at the police headquarters, Blagrove and Dickerson gave substantially similar statements regarding the robbery. When Detective Riegel met with Tuten on August 16, 2000, Tuten verified his true identity. He again reported that he knew one of his assailants. A few weeks later, Tuten informed the police that the suspect whom he knew by sight, was known on the street as "Omar Sadiq." This information allowed Detective Riegel to compose a photo array that was shown to Blagrove on August 28, 2000. After Blagrove immediately identified Dennis from this array as one of the assailants, Detective Riegel then showed it to Dickerson. Dickerson identified Dennis as one of the robbers with 75-80% clarity. The photo array was then shown to Tuten who also identified Dennis and then provided a taped statement concerning that identification.

. . .

Defendants were then indicted on October 10, 2000. Thereafter both Blagrove and Dickerson

sought to recant their prior identifications of
both Palmer and Hamilton.

At trial the three victims appeared as witnesses
for the State. Dickerson and Blagrove were
reluctant witnesses and were described by the
judge as "hostile." On the second day of trial,
outside the presence of the jury, the trial
judge conducted a Wade hearing to determine the
admissibility of identification evidence. That
hearing was held on the identification
procedures conducted by Detective Riegel with
Blagrove and Dickerson, regarding only Dennis.

(ECF No. 9-4 at 11-23.) After the hearing, the trial judge found the

identification procedures used by the detective were not

impermissibly suggestive. (Id. at 25-26.)

On direct appeal, Dennis raised the following issues: (1) the

evidence concerning the out-of-court identifications demonstrates

that the identifications were so overwhelmingly unreliable that the

verdict must be set aside; (2) Defendant's Sixth Amendment right to

counsel was violated at the initial stage of the proceeding below;

(3) the court's sentence was improper and should be vacated. (ECF

No. 1 at 2-3.) The Appellate Division addressed Dennis' claims on

appeal as follows:

Each defendant presents several issues
challenging the identification evidence. . . .
Palmer and Dennis   . . . assert that the
out-of-court identifications of them were
impermissibly suggestive and unreliable.

. . .

Andrew Dennis was also no stranger to any of the

7

three witnesses. Tuten knew him as a repeat drug customer, who had met Tuten outside the apartment earlier that very morning. Although it is true that neither man knew the other by his legal name, Tuten knew Dennis' face and Dennis knew Tuten by his street names "Fat Boy" and "Chauncey Fitzgerald." During the course of the investigation, Tuten was able to provide the police with Dennis' street name after making some inquiries of his own associates. Once Tuten relayed this information to Detective Riegel he, in turn, was able to pull photographs of suspects with similar names, including photographs of Dennis.

Dickerson also recognized Dennis as the man who had stopped Tuten on the street while Tuten awaited his cab. In his statement, Blagrove had also indicated that he recognized Dennis, having seen him on two prior occasions. Moreover, throughout the incident, Dennis was the only perpetrator not to have worn a mask. Therefore all three witnesses were able to view his face for some time.

Prior to trial both Blagrove and Dickerson had made identifications of Dennis through the use of photo arrays. According to Detective Riegel, using the information provided to him by Tuten, he prepared a six-photo array which had been shown to Blagrove on August 28, 2000, from which Blagrove immediately identified Dennis. Shortly thereafter, from this same array, Dickerson also quickly identified Dennis and indicated he was 75-80% sure he was the man in the yellow fleece. This same photo array was presented to Tuten on August 29, 2000; he too identified Dennis as the man in the yellow fleece.

Dennis argues that because the identifiers remained on his photo when shown to Tuten, the identification was unduly suggestive. As explained by the trial judge in his amplification concerning the identification

8

> issue, the photo array cannot be deemed unduly
> suggestive under circumstances where Tuten knew
> the suspect prior to the crime and had provided
> a description of him shortly after the crime
> occurred. That prior knowledge also supports
> the in-court identification despite Tuten's
> inability to choose Dennis' picture from an
> array shown to him the day before he testified.
> The identifications of Dennis were sufficiently
> reliable and not unduly suggestive. The issue
> of identification was properly submitted to the
> jury.

(ECF No. 9-4 at 33-44.)

The Appellate Division also held that Dennis's Sixth Amendment right to counsel was not violated by his lack of counsel at a probable cause hearing. (ECF No. 9-4 at 46.) Finally, the Appellate Division upheld Dennis' sentence. (Id. at 62-70.)

The New Jersey Supreme Court granted certification. State v. Dennis, 185 N.J. 300 (Oct. 27, 2005). The State conceded that defendants have a right to counsel at probable cause hearings. (Id. at 301.) The court, however, found the error was harmless because it was unlikely that counsel would have succeeded in preventing the case from going to the grand jury; the trial testimony conflicted only slightly with the hearing testimony; and the only witness at the hearing, Detective Riegel, was cross-examined at trial. Id. at 302. The United States Supreme Court denied certification. Dennis v. N.J., 547 U.S. 1045 (Mar. 27, 2006).

Dennis filed a petition for post-conviction relief on May 28,

2006. (ECF No. 1 at 3.) On October 23, 2007, the PCR Court granted defendant's application for correction of an illegal sentence[1] but denied his petition for other post-conviction relief. (ECF No. 9-15 at 1.)

The Appellate Division reversed and remanded for an evidentiary hearing. State v. Dennis, 2011 WL 31360 (N.J. Super. Ct. App. Div. Jan. 6, 2011). The court explained that Dennis had submitted a certification from his trial counsel that it was more likely than not that she failed to advise Dennis he was subject to a term of incarceration for 60 years, requiring him to serve 85% before becoming eligible for parole. Id. at *1-2. Dennis submitted he would have taken the plea offer for ten years if he had known this. Id. at 1. The Appellate Division held that Dennis made a prima facie claim with respect to both the performance and prejudice prongs of the Strickland test, and remanded for an evidentiary hearing before a different judge. Id. at 5.

The PCR Court held an evidentiary hearing on remand, and determined that Dennis did not receive ineffective assistance of counsel, and he was not prejudiced by any bad advice. (ECF No. 9-22 at 10-13.) The Appellate Division affirmed. State v. Dennis, 2014 WL 475238 (N.J. Super. Ct. App. Div. Feb. 27, 2014). The New Jersey

---

[1] The PCR Court resentenced Dennis to an aggregate term of sixty years in prison with a 40.5 year period of parole ineligibility. State v. Dennis, 2011 WL 31360, at *1 n.1.

Supreme Court denied certification on September 25, 2014. <u>State v.</u>
<u>Dennis</u>, 219 N.J. 630 (N.J. Sept. 25, 2014).

Dennis filed the present habeas petition under 28 U.S.C. § 2254
on October 20, 2014. He alleged the following four grounds for relief:

> GROUND ONE:  The defendant was denied his
> constitutional rights to the effective
> assistance of counsel, right to a fair trial and
> due process of the law since trial counsel
> failed to advise the defendant that he was
> subject to an extended term and that the
> sentence he could receive could actually be
> imposed.
>
> GROUND TWO:  Defendant's Sixth Amendment Right
> to counsel was violated at the initial stage of
> the proceeding below.
>
> GROUND THREE:  Defendant was deprived of his
> Sixth and Fourteenth Amendment right to
> effective assistance of trial counsel, by trial
> counsel['s] failure to object to the tactic used
> by the State, in which the prosecutor conducted
> a post indictment identification of Defendant
> without Defendant['s] attorney being present,
> violating Defendant['s] Sixth Amendment right
> to counsel.
>
> GROUND FOUR:  The evidence concerning the
> out-of-court and in-court identifications
> demonstrates that the identifications were so
> overwhelmingly unreliable that the verdict must
> be set aside.

(ECF No. 1 at 17-36.)

Four days after Dennis filed his habeas petition, he filed a
second petition for post-conviction relief in State court on October
28, 2014. (ECF No. 11 at 4.) In that petition, Dennis claimed that

the State court violated his constitutional right to self-representation by never holding a <u>Faretta</u> Hearing.[2] (<u>Id.</u>) The Court notes that Dennis did not raise his <u>Faretta</u> claim in the present habeas petition, and he signed the following certification in the petition on October 14, 2014:

> I declare (or certify, verify, or state) under penalty of perjury that I have been notified that I must include in this petition all the grounds for relief from the conviction or sentence that I challenge, and that I must state the facts that support each ground. I also understand that if I fail to set forth all the grounds in this petition, I may be barred from presenting additional grounds at a later date.

(ECF No. 1 at 15.) Therefore, the Court will reach the merits of the four claims in the habeas petition.

II.   <u>DISCUSSION</u>

    A.   <u>Standard of Review</u>

    28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[2] <u>See Faretta v. California</u>, 422 U.S. 806, 821 (1975) (the Sixth Amendment implies a right of self-representation).

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). The phrase "clearly established Federal law" "refers to the holdings, not the dicta" of the U.S. Supreme Court's decisions. Williams, 529 U.S. at 412.

An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. Eley, 712 F.3d at 846 (quoting Renico v. Lett, 130 S.Ct. 1855, 1862 (2010)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011). When the highest state court did not provide a reasoned opinion on the issue under review, the habeas court should look

13

through to the last reasoned decision of the state courts. <u>Bond v.</u>
<u>Beard</u>, 539 F.3d 256, 289-90 (3d Cir. 2008).

      B.    <u>Exhaustion</u>

     Respondents contend Dennis failed to exhaust his State court
remedies on Ground Three of the habeas petition because he did not
raise this issue in the State Appellate Court or State Supreme Court.
(ECF No. 8 at 36.) In Ground Three, Dennis alleged he was denied
effective assistance of trial counsel because counsel failed to
object when the prosecutor conducted a post-indictment
identification of Defendant without his attorney present. (ECF No.
1 at 30.)

     A threshold requirement for a petition under 28 U.S.C. § 2254
is that "the petitioner must have first exhausted in state court all
of the claims he wishes to present to the district court." <u>Heleva</u>
<u>v. Brooks</u>, 581 F.3d 187, 189-90 (3d Cir. 2009) (citing 28 U.S.C. §
2254(b)(1)(A)). Nonetheless, this Court is permitted to deny
unexhausted habeas claims on the merits. <u>See</u> 28 U.S.C. § 2254(b)(2)
("[a]n application for a writ of habeas corpus may be denied on the
merits, notwithstanding the failure of the applicant to exhaust the
remedies available in the courts of the State"); <u>see also</u> <u>Carrascosa</u>
<u>v. McGuire</u>, 520 F.3d 249, 255, n. 10 (3d Cir. 2008) ("[d]enying [an
unexhausted claim] on the merits is consistent with the statute").

     For the reasons discussed below, the Court finds Ground Three

of the petition is without merit. Therefore, the Court will not remand this mixed petition to State court, and the Court will address the merits of each ground for relief.

C.   <u>Ground One</u>

In Ground One, Dennis alleged he was denied effective assistance of counsel because trial counsel failed to advise him that he was subject to an extended term of imprisonment such as he received. (ECF No. 1 at 17.) Respondents argued the State Appellate Court reasonably applied federal law in finding that Dennis' trial attorney advised him of his exposure to an extended term of imprisonment, and Dennis was not prejudiced by his attorney's conduct. (ECF No. 8 at 25.)

In reviewing the remanded PCR Court decision, the Appellate Division stated:

> As we directed, the proceeding was conducted before a different judge, who heard testimony from defendant and his sister, Denise Worthy, and considered various documents including the aforementioned certifications of defendant and trial counsel as well as correspondence between defendant and trial counsel. According to defendant, the first time he learned he was extended term eligible was post-trial, even though the transcript of the February 7, 2001 pre-trial status conference reveals that the prosecutor stated, contemporaneous with the plea offer rejected by defendant, that defendant was extended term eligible. As the PCR judge noted:
>
>> the prosecutor did not state this fact in passing but as part of a conversation about the merits of the

15

> plea offer. The [p]rosecutor
> informed the court of [defendant's]
> six prior indictable convictions,
> and the court informed the
> [defendant] that it would not even
> consider the ten year sentence, serve
> five [year] period of parole
> ineligibility, and that [t]en years
> is not what [the court] consider[ed]
> a proper sentence, for armed robbery.

Moreover, as found by the PCR judge, defendant's sister testified that there was public information as to the possibility that defendant would be sentenced as a repeat offender. In fact, on July 12, 2001, she wrote to defendant's trial counsel indicating her concern over the potential for extended-term sentencing and beseeching counsel to help defendant avoid "being sentenced as a repeat offender" and "being incarcerated double time[.]" And in preparation for sentencing, trial counsel wrote defendant a one-page letter, in which she referred four times to an "extended term."

In his testimony before the PCR judge, defendant also claimed he did not have an opportunity to discuss the events of August 14, 2000 with his attorney and had no recollection of telling a defense investigator that he had "no knowledge" of his victim's brutal robbery. However, correspondence from counsel to defendant pre-trial indicates the two had communicated about the case but that, as later correspondence from counsel reveals, defendant had not told her the truth about the underlying events. Indeed, while professing not to remember anything about his victim's trial testimony except "a bunch of lies," and telling counsel before trial that he did not shoot the victim, defendant testified at the PCR hearing that he was guilty.

Although defendant claimed in his PCR petition that he was induced to reject the State's plea

16

offer by his attorney's advice that he faced a maximum of only twenty years in prison with a NERA parole disqualifier, in his testimony at the evidentiary hearing, defendant did not attribute his plea rejection to any one cause. On the contrary, as correspondence to his sister reveals, defendant believed the State could not prove his guilt, as its proofs were weak and based on a faulty identification. Prior to trial, defendant informed his sister that his "legal situation look[ed] good[,]" and around the same time, he also informed trial counsel that he was "not interested in a deal" with the State. In fact, defendant told his trial attorney that, rather than strike any "deal" with the State, he would take his chances with a trial and "do whatever time" came his way if he were found guilty.

At the close of evidence, the PCR judge rejected defendant's claim of ineffectiveness of trial counsel, finding neither deficient performance by counsel nor prejudice to defendant. In so ruling, the court found defendant's testimony "unpersuasive, self-serving, inadequate, and of little objective value." Specifically, as to counsel's performance, defendant's "repeated statements that he was never informed he was extended term eligible, despite indisputable evidence to the contrary, calls into question his credibility and his memory." His testimony in this regard "was internally inconsistent, self-serving and ultimately unpersuasive." As were his bald assertions during the evidentiary hearing that counsel had done "nothing" in her representation of him, convincingly belied, in the PCR court's view, by "counsel's statements to the trial court as to the nature and progress of her representation of [defendant]" throughout, and her favorable result at a Wade hearing.

As for trial counsel's certification that she may have advised defendant that his sentencing exposure was twenty years with a NERA parole

disqualifier, instead of sixty years subject to NERA, the PCR court found the document "equivocal at best" and defendant's reliance thereon "misplaced":

> First and foremost, trial counsel did not state with certainty that she had misinformed [defendant]. Second, and quite unfortunately, trial counsel passed away after a long battle with cancer on March 23, 2008, a battle she was in the midst of fighting at the time of her certification. Given [counsel's] serious health problems it is likely that she was unable to bring a detailed, accurate, and reliable reflection to her certification. The unfortunate circumstances of her passing and subsequent unavailability deprive the court of any opportunity to question the reliability and accuracy of her ambivalent certification. As such the court affords little weight to [it].
>
> ....
>
> [T]he court places little reliance on the much discussed certification of trial counsel. It is inconclusive as to what trial counsel may have informed [defendant] as to his sentence exposure, and is furthermore a hearsay statement made by counsel a scant few months before her all too early death.

Even assuming counsel's misadvice, the PCR court found no prejudice inured to defendant as a result. On this score:

> The [c]ourt is not persuaded that, but for trial counsel's miscalculation of [defendant's]

18

sentence exposure, [defendant] would not have gone to trial and faced sentencing upon conviction in the court's discretion.

It should first be noted, although it is not dispositive of the [defendant's] claim, that the trial court clearly stated that it would not have accepted a plea bargain for ten years, even given the application of NERA.

....

Also on point, and more persuasive, is the fact that [defendant] repeatedly indicated to multiple persons that he did not believe the State could meet its burden.

....

The weight of the evidence suggests that [defendant] miscalculated the strength of the State's proofs. The [defendant's] recent indications that he would have taken the plea if he only knew he was facing such a lengthy extended term are not supported by the record. The record more accurately reflects Petitioner as a defendant who was going to trial no matter what.

Here, the [defendant] was not interested in a plea bargain and would have gone to trial regardless of his sentence exposure. [Defendant] mistakenly believed that the State could not prove its case. In light of the above the court finds that the [defendant] has not demonstrated that he was prejudiced by any alleged misadvice, but rather

19

took his chances with judge and jury.

Although the PCR judge rejected defendant's
ineffective assistance of counsel claim, in
"the interests of justice" he returned
defendant to the status quo ante before
sentencing, vacated the sentence and later
resentenced defendant on the first-degree armed
robbery conviction (count one) to twenty years'
imprisonment with an eighty-five percent parole
bar, for an aggregate thirty-year term subject
to NERA.

. . .

In the present context, defendant was required
to show that he would have accepted the plea
offer if he had been aware of his sentence
exposure and that his guilty plea would have
ultimately been accepted by the court. As the
facts adduced and the evidentiary hearing make
clear, however, defendant has failed to prove
either the performance or prejudice prongs of
the Strickland/Fritz test. We find no merit to
defendant's contrary contentions on appeal,
Rule 2:11-3(e)(2), and therefore affirm,
substantially for the reasons stated by the PCR
judge in his thorough and well-articulated
letter opinion of January 6, 2012.

State v. Dennis, 2014 WL 475238, at *2-5 (Feb. 7, 2014).

The test announced by the Supreme Court in Strickland v.
Washington, 466 U.S. 668, 687 (1984), governs claims that a
petitioner was denied a fair trial because his counsel provided
ineffective assistance. The Strickland test has two prongs:

First, the defendant must show that counsel's
performance was deficient. This requires
showing that counsel made errors so serious that
counsel was not functioning as the "counsel"
guaranteed the defendant by the Sixth

20

> Amendment. Second, the defendant must show that
> the deficient performance prejudiced the
> defense. This requires showing that counsel's
> errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result
> is reliable.

Strickland, 466 U.S. at 687.

The first prong of the test "requires a defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" Lafler v. Cooper, 132 S.Ct. 1376, 1384 (2011) (quoting Hill v. Lockhart, 474 U.S. 52, 57 (1985) (quoting Strickland, 466 U.S. at 688)). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (per curiam) (citing Bell v. Cone, 535 U.S. 685, 702 (2002); Kimmelman v. Morrison, 477 U.S. 365, 382 (1986); Strickland, 466 U.S. at 689; United States v. Cronic, 466 U.S. 648, 656 (1984)).

The second prong of the Strickland test, prejudice, requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." <u>Strickland</u>, 466 U.S. at 694. The "ultimate focus" of the prejudice inquiry is on the fundamental fairness of the proceeding. <u>Lafler</u>, 132 S.Ct. at 1394 (quoting <u>Strickland</u>, 466 U.S. at 696). "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" <u>Collins</u>, 742 F.3d at 547 (quoting <u>Strickland</u>, 466 U.S. at 694). "Prejudice is viewed in light of the totality of the evidence at trial and the testimony at the collateral review hearing." <u>Id.</u> (citing <u>Rolan v. Vaughn</u>, 445 F.3d 671, 682 (3d. Cir. 2006)).

Here, neither the Appellate Division's factual findings nor the Appellate Division's application of <u>Strickland</u> was unreasonable. There is sufficient factual evidence supporting a finding that Dennis was aware of his extended term sentence exposure, the he was not interested in accepting a plea, and that the trial court would not have accepted a plea to ten years imprisonment. Even if one concluded that counsel did not advise Dennis that he could receive a sentence as great as he actually received, sixty years, the Appellate Division did not unreasonably apply the prejudice standard in finding Dennis would not have taken the plea or, alternatively, the trial judge would not have accepted it. Therefore, Ground One of the habeas petition will be denied.

 D. <u>Ground Two</u>

In Ground Two, Dennis alleged he was deprived of his Sixth

Amendment right to counsel at a probable cause hearing held on October 3, 2000. (ECF No. 1 at 28; Transcript, ECF No. 8-3) At the hearing, the arresting officer testified about witness identifications of Dennis, and photo array identifications made at the witness' house. (ECF No. 1 at 28-29.) Respondents stated that the New Jersey Supreme Court reviewed Dennis' claim under Coleman v. Alabama, 399 U.S. 1 (1970) and determined that the error was harmless. (ECF No. 8 at 32.) Respondents argued the New Jersey Supreme Court reasonably applied federal law in finding harmless error under Chapman v. California, 386 U.S. 18, 23-24 (1967).

Dennis replied that complete denial of counsel at the probable cause hearing was a structural defect in the trial which requires automatic reversal without analysis for harmless error. (ECF No. 11 at 26.) Dennis cites United States v. Cronic, 466 U.S. 648, 659, n. 25 (1984), asserting that prejudice is presumed when counsel is totally absent during a critical stage of the proceeding. (Id. at 27-28.) The controlling Supreme Court case is Coleman, where the Court held that an accused person has a Sixth Amendment right to counsel at a preliminary hearing where it is determined whether there is sufficient evidence against the accused to warrant presenting his case to the grand jury. 399 U.S. at 8-10. It is undisputed that Dennis was denied counsel at such a preliminary hearing. The question is what relief is appropriate. In Coleman, the Court held that "[t]he

23

test to be applied is whether the denial of counsel at the preliminary hearing was harmless error under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." (Id. at 10-11 (citing U.S. v. Wade, 388 U.S. at 242.))

The test set forth in Chapman is that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. The New Jersey Supreme Court found Dennis was entitled to counsel at his probable cause hearing, but the failure to provide him with counsel was harmless because if counsel been present, it was unlikely that counsel:

> would have been able to persuade the judge not to bind defendant over to the grand jury. The trial testimony conflicted only slightly with the hearing testimony, and defense counsel could have discovered those inconsistencies from the hearing transcript. Further, the only witness at the hearing, Detective Riegel, testified and was cross-examined at trial; none of defendant's disclosures at the hearing were used against him at trial; and sufficient evidence existed to support defendant's indictment and conviction. Although defense counsel may have been able to discover more of the State's case at the hearing, we conclude that there is no evidence to support prejudice on this point.

State v. Dennis, 185 N.J. 300, 302 (N.J. Oct. 27, 2005).

The transcript of the probable cause hearing shows that Riegel was the only person who testified, and he explained how he was able

24

to identify Dennis as a suspect, and then obtain identifications of Dennis by the witnesses. (ECF No. 8-3 at 4-7.) Dennis asked Riegel only one question at the hearing, how many persons picked him out of a photo line-up? (Id. at 7.) Riegel replied:

> I'll clarify. When I showed the two witnesses I showed them what we call a photo array. The photo lineup was done by the victim. There --
>
> Q. [Dennis] So you're saying three people picked me out of a lin—photo array?"
>
> A. [Riegel] yes."

(Id.)

Defense counsel later cross-examined Riegel at a Wade hearing outside the presence of the jury, and again in the presence of the jury. (ECF No. 8-11 at 33-56; ECF No. 8-17 at 120-171, 178-83.) Additionally, defense counsel extensively challenged the witness identifications offered by the State, helped by the fact that two of the three witnesses recanted their identifications at trial. (ECF No. 8-13 at 117-18; 128-76; 182-87; ECF No. 8-14 at 33-37; ECF No. 8-15 at 54-64; 160-183; 185-187.) The jury, having been presented with all of the circumstances surrounding the identifications and the recantations, found Dennis guilty.

Here, the record supports, beyond a reasonable doubt, that the failure to appoint counsel for Dennis at the preliminary hearing was harmless because when counsel challenged the identifications, even after two witnesses recanted, the jury found Dennis guilty. There

does not appear to be anything that counsel could have done at the hearing to change the result of the criminal proceeding.

E.    <u>Ground Three</u>

Dennis alleged in support of Ground Three:

> During the State['s] case[,] before the victim Tuten was to testify, the Prosecutor Investigator had [the] victim appear in the courtroom during a recess to identify petitioner and his co-defendants[.] [W]hen the victim was brought up to the courtroom to testify[,] petitioner and the co-defendants alerted their lawyers that the prosecutor investigator had the victim identify them while the attorneys where [sic] not present. The following colloquy took place in the courtroom:
>
> . . .
>
> Attorney: I represent this gentleman over here, Mr. Hamilton. Now I'm going to ask you a question. Where [sic] you in this courtroom yesterday?
>
> Victim [Tuten]: No, sir.
>
> . . .
>
> [at side bar]
>
> Attorney: I was told by the people sitting in the audience and by my client that he came in this courtroom for I don't know how long and he was sitting next to the investigator long enough to see the three gentlemen sitting at the table. That's what I was told.
>
> Prosecutor: Well, that's fine, because I was told the same thing by my investigator, that they're saying that. And he said that's impossible. So if you want to have a hearing out of the presence of the jury that's fine because

26

this line of questioning is totally
inappropriate. I don't care what those people
said. Let's have a hearing. Let's get the jury
out of here.

Attorney. Okay.

The Court. Fine.

Prosecutor: Investigator Cormack informed me
that at lunch break he brought Mr. Tuten,
because I sat and talked with Mr. Tuten at this
table during the lunch break. He did not observe
and he saw these guys being brought out in hand
cuffs. That's it.

The Court: No, I don't think it's brought out
for that point. I think it's brought out because
of the identification, I would think . . . If
your concern is that he saw these gentlemen in
the courtroom and then you are trying to make
the allegation that that's the only reason he
identified them then that would be fair inquiry
if he was in here yesterday while they were in
here yesterday.

. . .

Attorney: Mr. Tuten, were you in this courtroom
yesterday?

Victim: Yes sir, briefly.

Attorney: Where were you seated in this
courtroom?

Victim: Right beside this investigator right
here.

Attorney: Okay. Did you have opportunity to see
these three gentlemen seated at the table?

Victim: No, I never saw them seated at no table.

Attorney: Did you see them in this courtroom,

27

the three of them?

Victim: I saw them enter in this door right here
from the back.

. . .

Attorney: How long were you in this courtroom?

Victim: Probably three minutes.

Prosecutor: How long a period of time would you
be able to guess you were able to look at them?

Victim: Two seconds.

(ECF No. 1 at 30-35.)

Respondents argued there was no post indictment identification
because Tuten only observed the back of the three defendants as they
walked out of the courtroom for approximately two seconds. (ECF No.
8 at 36-37.) Furthermore, Respondents contend an accidental
courthouse encounter does not qualify as a lineup nor is it unduly
suggestive per se. (Id. citing U.S. v. Colclough, 549 F.2d 937, 941-42
(4th Cir. 1977).

In reply, Dennis asserted a reasonable inference could be drawn
from the colloquy that the State intentionally conducted a
post-indictment identification when defense counsel was not present.
(ECF No. 11 at 36.) According to Dennis, when Investigator Keith
Cormack testified, he said Tuten was unable to identify Dennis from

a photo array the day before he testified in front of the jury. (Id.)[3]
Then, Tuten was able to identify Dennis at trial the next day. (Id.)
Dennis concluded that the State's entire case was based on
identification; therefore, conducting a witness identification
without counsel present, one day before the witness was to testify,
violated his right to counsel at a critical stage of trial. (Id. at
36-37) (citing U.S. v. Wade, 388 U.S. 218 (1967)).

Even if this Court assumes the State created a situation where
the victim could view the defendants in the courtroom the day before
the victim's testimony, if the victim's identification is reliable,
the testimony need not be excluded. Perry v. New Hampshire, 132 S.Ct.
716, 725 (2012) (citing Manson v. Brathwaite, 432 U.S. 98, 116
(1977.)) Here, Tuten knew Dennis as a repeat drug customer, although
he did not know his name. (ECF 8-13 at 61, 64-65.) Tuten later gave
police Dennis' nickname, which helped them find Dennis. (Id. at
107-08.) Tuten saw Dennis the morning of the robbery, and Dennis did
not cover his face during the robbery. (ECF No. 8-13 at 59-60, 66-68.)
Tuten also identified Dennis from a photo array on August 29, 2000.
(Id. at 109-11.) When Tuten made his in-court identification of
Dennis, he said he had no doubt Dennis was the unmasked robber. (Id.

---

[3] It is not clear from the trial transcript that Cormack showed Tuten
a photo of Dennis the day before Tuten's testimony. (ECF No. 8-19
at 11-12.) What is clear is that Tuten was unable to make a
photographic identification of Defendants Hamilton and Palmer. (Id.)

at 112.)

For these reasons, Tuten's identification was sufficiently reliable to allow presentation to the jury, and the jury could decide the credibility of the witnesses regarding identification. Perry, 132 S.Ct. at 720 ("if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." Thus, Ground Three will be denied on the merits.

F.   Ground Four

In Ground Four, Dennis alleged that the in and out-of-court identifications were so overwhelmingly unreliable that the verdict must be set aside. (ECF No. 1 at 36.) Dennis challenged Tuten's identification because Tuten told Detective Riegel he could not identify the third intruder because he had a hood over his face. (Id.) At the hospital, Tuten could not describe the people who robbed him. (Id.) One day before testifying at trial, Tuten was unable to make a photographic identification of any of the defendants. (Id. at 37.)

Respondents asserted the State appellate court decision denying this claim was not unreasonable under 28 U.S.C. § 2254(d)(1) or (2). (ECF No. 8 at 38.) Dennis replied by citing inconsistencies in the witnesses' descriptions of the robbers. (ECF No. 11 at 39-44.) Dennis also challenged the procedures used in the photo arrays presented

30

to Blagrove and Dickerson because in his photo, Dennis was holding
a placard with his name on it, and none of the other persons in the
photo array were holding a placard. (Id. at 41-42.)

Dennis further notes that Dickerson and Blagrove felt pressured
to make an identification because they were constantly reminded that
they could be prosecuted for drug charges. (Id. at 42-43.) At trial,
Dickerson could not make an identification of Dennis, and Dickerson
denied making an out-of-court identification by photo array. (Id.
at 43.)

The Supreme Court case governing pretrial identification by a
witness is Manson v. Brathwaite, 432 U.S. 98 (1977). Brathwaite
dictates that convictions based on eyewitness identification at
trial, which followed a pretrial identification by photograph, will
only be set aside if the photo identification procedures were "so
impermissibly suggestive to give rise to a very substantial
likelihood of irreparable misidentification." Id. at 116.

The Appellate Division on direct appeal held:

> Andrew Dennis was also no stranger to any of the
> three witnesses. Tuten knew him as a repeat drug
> customer, who had met Tuten outside the
> apartment earlier that very morning. Although
> it is true that neither man knew the other by
> his legal name, Tuten knew Dennis' face and
> Dennis knew Tuten by his street names "Fat Boy"
> and "Chauncey Fitzgerald." During the course of
> the investigation, Tuten was able to provide the
> police with Dennis' street name after making
> some inquiries of his own associates. Once Tuten

31

relayed this information to Detective Riegel
he, in turn, was able to pull photographs of
suspects with similar names, including
photographs of Dennis.

Dickerson also recognized Dennis as the man who
had stopped Tuten on the street while Tuten
awaited his cab. In his statement, Blagrove had
also indicated that he recognized Dennis,
having seen him on two prior occasions.
Moreover, throughout the incident, Dennis was
the only perpetrator not to have worn a mask.
Therefore all three witnesses were able to view
his face for some time.

Prior to trial both Blagrove and Dickerson had
made identifications of Dennis through the use
of photo arrays. According to Detective Riegel,
using the information provided to him by Tuten,
he prepared a six-photo array which had been
shown to Blagrove on August 28, 2000, from which
Blagrove immediately identified Dennis.
Shortly thereafter, from this same array,
Dickerson also quickly identified Dennis and
indicated he was 75-80% sure he was the man in
the yellow fleece. This same photo array was
presented to Tuten on August 29, 2000; he too
identified Dennis as the man in the yellow
fleece.

Dennis argues that because the identifiers
remained on his photo when shown to Tuten, the
identification was unduly suggestive. As
explained by the trial judge in his
amplification concerning the identification
issue, the photo array cannot be deemed unduly
suggestive under circumstances where Tuten knew
the suspect prior to the crime and had provided
a description of him shortly after the crime
occurred. That prior knowledge also supports
the in-court identification despite Tuten's
inability to choose Dennis' picture from an
array shown to him the day before he testified.
The identifications of Dennis were sufficiently
reliable and not unduly suggestive. The issue

> of identification was properly submitted to the
> jury.

(ECF No. 9-4 at 43-44.)

The possibility that a photo of Dennis was used that showed him holding a placard with his name on it, and the other persons in the photo arrays were not holding placards, was an impermissibly suggestive procedure used in the out-of-court identifications. However, use of an impermissibly suggestive procedure does not per se require that the identifications be excluded. Brathwaite at 113. If there are other factors supporting reliability of the identifications, under the totality of the circumstances, the identifications may be admissible. Id. The factors include:

> the opportunity of the witness to view the
> criminal at the time of the crime, the witness'
> degree of attention, the accuracy of his prior
> description of the criminal, the level of
> certainty demonstrated at the confrontation,
> and the time between the crime and the
> confrontation. Against these factors is to be
> weighed the corrupting effect of the suggestive
> identification itself.

Id. at 114.

The Appellate Division did not unreasonably apply this standard when it found the identifications were properly submitted to the jury because Tuten knew Dennis as a prior drug customer, and they had met earlier on the day of the robbery. Dickerson also recognized Dennis because he saw him talking to Tuten earlier on the day of the robbery.

33

Blagrove recognized Dennis as a repeat drug customer of Tuten.

Furthermore, the Appellate Division found that Dennis did not wear a mask, and all three witnesses saw his face for some time during the robbery. The Appellate Division was not persuaded by Dickerson and Blagrove's later recantations of their out-of-court identifications. Based on the evidence in the record as a whole, the Appellate Division's factual findings and its application of Brathwaite were reasonable. Therefore, Ground Four will be denied.

III. CERTIFICATE OF APPEALABILITY

This Court must determine whether Dennis is entitled to a certificate of appealability in this matter. See Third Circuit Local Appellate Rule 22.2. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Dennis has not made a substantial showing, and this Court will not issue a certification of appealability.

IV. CONCLUSION

In the accompanying Order filed herewith, the Court will deny the habeas petition.


Dated: November 5, 2015

                              s/Renée Marie Bumb
                              **RÉNÉE MARIE BUMB**
                              United States District Judge